# CORNING GLASS WORKS, INC.

## V.

# VIRGINIA DEPARTMENT OF TAXATION

Record No. 900872

March 1, 1991

Present: All the Justices

*John M. Wood (Daniel K. Steen; Michael D. Smith; Reed, Smith, Shaw & McClay*, on briefs), for appellant.

*Martha B. Brissette, Assistant Attorney General (Mary Sue Terry, Attorney General; H. Lane Kneedler, Chief Deputy Attorney General; K. Marshall Cook, Deputy Attorney General; Barbara M. Rose, Senior Assistant Attorney General*, on brief), for appellee.

JUSTICE HASSELL delivered the opinion of the Court.

In this appeal, we consider whether the Fourteenth Amendment of the United States Constitution[1] prohibits the Virginia Department of Taxation from taxing capital gains and interest income that Corning Glass Works, Inc., a multistate and multinational corporation, received from a corporation in which it owned a significant stock interest.

Corning Glass, incorporated in New York, transacts business in most states and in approximately 12 foreign countries. In 1982 and 1983, the relevant tax years, Corning Glass' principal place of business was in Corning, New York. In those years, Corning Glass developed, manufactured, and marketed consumer products, consumer durable components, capital goods components, and health and science products.

In the late 1930's, Corning Glass and Owens-Illinois Glass Company formed Owens-Corning Fiberglas Corporation. Owens-Corning was created to develop, manufacture, and sell fiber glass products. Corning Glass appointed members to Owens-Corning's board of directors and exercised strategic control and influence over Owens-Corning.

In July 1948, the United States of America filed an amended complaint in a federal district court in Ohio, and alleged that Corning Glass, Owens-Corning, and Owens-Illinois had committed certain antitrust violations in contravention of the Sherman Act. A consent decree, in the form of a final judgment, was entered by the court on June 23, 1949.

Pursuant to the terms of the judgment, Corning Glass, its officers, directors, and employees, were prohibited from serving as officers, directors, or employees of Owens-Corning. Corning Glass

---

[1] The Fourteenth Amendment of the United States Constitution provides in part that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

was enjoined and restrained, so long as it was entitled to vote any of the shares of the capital stock of Owens-Corning, from:

(A) Participating in, controlling, directing or influencing in any manner whatsoever any act or commercial policy of Owens-Corning except with respect to the matters as to which stock can be voted as set forth in this Article;

(B) Exercising the right to vote any stock of Owens-Corning for any purpose other than (1) the election or removal of directors; subject to the provisions . . . of this Article; and (2) such necessary business acts as, under Owens-Corning's certificate of incorporation, require the vote of the stock of Owens-Illinois and Corning and are approved by the Attorney General . . . .

(C) Exercising the right to vote the stock of Owens-Corning for the election of any individual as a director who shall not be approved by the Court . . . .

(D) Exercising the right to vote the stock of Owens-Corning for the removal of any director unless the Court shall approve such proposed action.

Corning Glass, its officers, directors, agents, employees, successors, and all persons acting under, through, or for Corning Glass were required to comply with the judgment. The court retained jurisdiction over Corning Glass, Owens-Illinois, and Owens-Corning for the purpose of modification, enforcement, or termination of the order.

Corning Glass' relationship with Owens-Corning changed significantly after the entry of the judgment. Owens-Corning's directors who had been appointed by Corning Glass resigned. Corning Glass ceased having any relationship, except on a third-party basis and as a large stockholder, with Owens-Corning. Corning Glass instructed its employees that they could not have any business dealings with Owens-Corning.

In 1978, Corning Glass sought and obtained a modification of the 1949 judgment. The modified judgment required that Corning Glass dispose of its stock in Owens-Corning by 1986. Corning Glass sold 3,000,000 shares of its stock to Owens-Corning in late 1982. The proceeds were placed in the general operating funds of Corning Glass.

Corning Glass acquired, divested, and maintained stock in numerous foreign and domestic corporations. Between 1964 and 1982, these investments accounted for approximately 28% of Corning Glass' income. In 1982, Corning Glass owned in excess of 7,000,000 shares of Owens-Corning stock, which represented a 24% ownership interest.

In 1983 and 1984, Corning Glass realized capital gains and interest income totaling $101,761,570 from the sale of some of its Owens-Corning stock.[2] Corning Glass deducted this income from its total income in computing the apportionable income reported on its 1983 and 1984 Virginia corporate income tax returns.[3] Upon audit, the Department included the capital gains and interest in Corning Glass' apportionable income and assessed Corning Glass with additional taxes for 1983 and 1984 totaling $173,571.90, plus interest of $62,120. Corning Glass filed applications for administrative correction of assessments with the Tax Commissioner. The applications were denied.

Corning Glass paid the taxes and interest in dispute and filed an amended application for relief from tax assessment in the circuit court. The trial court considered evidence and memoranda of counsel, and concluded that the Department was constitutionally permitted to tax the capital gains and interest income that Corning Glass realized from the sale of its stock in Owens-Corning because, "[a] unitary business exists with respect to Corning and its investment in [Owens-Corning]."

On appeal, Corning Glass argues that the circuit court erred because it did not properly apply the unitary business principle to determine whether the Due Process Clause of the Fourteenth Amendment permitted the Department to tax the capital gains and interest income. Corning Glass asserts that it and Owens-Corning do not comprise a unitary business, but rather that Owens-Corning is a discrete business enterprise which has no relationship to Corning Glass' presence in Virginia. The Department,

---

[2] Corning Glass operated two manufacturing plants and a sales office in Virginia. Owens-Corning also conducted business in Virginia.

[3] Virginia's allocation and apportionment taxation scheme was enacted by the General Assembly in 1981. Dividends received by nondomiciliary corporations, such as Corning Glass, are allocated to the commercial domicile and the corporation's remaining taxable income is apportioned for taxation by Virginia. *See* Code §§ 58.1-407 through 420. Title 58 of the Code was recodified in Title 58.1 in 1984. *See* 1984 Acts, c. 675. The recodification made no substantive changes relevant to this appeal.

however, contends that Corning Glass' acquisition and divestiture of stock was "a regular and integral" business activity which rendered its relationship with Owens-Corning "unitary" and, therefore, taxation of the capital gains and interest income is constitutionally permissible.

■ The Due Process Clause of the Fourteenth Amendment prohibits a state from imposing a tax on income earned outside of its borders unless there is a "minimal connection" or "nexus" between the interstate activities and the taxing state and "a rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Exxon Corp.* v. *Wisconsin Department of Revenue*, 447 U.S. 207, 219-20 (1980) (quoting *Mobil Oil Corp.* v. *Commissioner of Taxes*, 445 U.S. 425, 436-37 (1980)).

It is undisputed that Corning Glass has a "minimal connection" with Virginia. Corning Glass conducts business in Virginia and therefore "avails itself of the 'substantial privilege of carrying on business' within the State." *Id.* at 220 (*quoting Mobil Oil Corp.*, 445 U.S. at 437). The legal principles which we must apply in ascertaining whether "a rational relationship between the income attributed to the State and the intrastate values of the enterprise" exists were discussed and applied by the Supreme Court in *F. W. Woolworth Co.* v. *Taxation and Revenue Dept.*, 458 U.S. 354 (1982); *ASARCO Inc.* v. *Idaho State Tax Comm'n*, 458 U.S. 307 (1982); *Exxon Corp.*; and *Mobil Oil Corp.*

■ The Court, in *Exxon Corp.*, discussed the fundamental precept which must be met when a state seeks to tax income generated beyond its borders:

> The 'linchpin of apportionability' for state income taxation of an interstate enterprise is the 'unitary-business principle.' . . . If a company is a unitary business, then a State may apply an apportionment formula to the taxpayer's total income in order to obtain a 'rough approximation' of the corporate income that is 'reasonably related to the activities conducted within the taxing State . . . .' The court looks to the 'underlying economic realities of a unitary business,' and the income must derive from 'unrelated business activity' which constitutes a 'discrete business enterprise.'

447 U.S. at 223-24 (citations omitted).

In *Mobil Oil Corp.*, the Court considered whether the Due Process Clause permitted a state to tax dividend income that a non-domiciliary corporation received from subsidiaries and affiliates doing business abroad.

■ Mobil conducted an international integrated petroleum business which included petroleum exploration, production, refining, transportation, distribution, sales, and chemical and mining enterprises. The State of Vermont imposed a tax, using an apportionment formula, upon Mobil's dividend income that it received from subsidiaries and affiliates which did not conduct business in Vermont. Mobil argued that taxation of the dividend income by Vermont violated, among other things, the Due Process Clause of the Fourteenth Amendment. The Court, summarizing established principles of corporate taxation, stated:

> For a State to tax income generated in interstate commerce, the Due Process Clause of the Fourteenth Amendment imposes two requirements: a 'minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise . . . . The requisite 'nexus' is supplied if the corporation avails itself of the 'substantial privilege of carrying on business' within the State; and '[t]he fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction.'

445 U.S. at 436-37 (citations omitted).

Even though the Court concluded that a unitary business relationship existed among Mobil and its subsidiaries, which vested with Vermont the constitutional power to tax the dividend income, the Court cautioned:

> We do not mean to suggest that all dividend income received by corporations operating in interstate commerce is necessarily taxable in each State where that corporation does business. Where the business activities of the dividend payor have nothing to do with the activities of the recipient in the taxing State, due process considerations might well preclude apportionability, because there would be no underlying unitary business.

*Id*. at 441-42.

In *ASARCO Inc.* v. *Idaho State Tax Comm'n, supra*, the Court considered whether Idaho could tax dividend, interest, and capital gains income that a nondomiciliary corporation received from subsidiary corporations which had no other connection with Idaho.

ASARCO, with its five subsidiaries, conducted a vertically integrated metals operation. ASARCO was the sole stockholder in each subsidiary and received dividend income from each subsidiary. ASARCO and its subsidiaries had interlocking officers and directors which enabled ASARCO to control the major management decisions of each subsidiary. The sales between the companies were numerous making it "apparent . . . that the companies supplied markets to each other." ASARCO and its subsidiaries shared certain services. 458 U.S. at 313.

The Court, applying the unitary business principle, analyzed the business relationships which existed between ASARCO and each of its five subsidiaries and held that a unitary business relationship between ASARCO and its subsidiaries did not exist. Rejecting Vermont's argument that the dividend, interest, and capital gains income should be considered a part of a unitary business because the income was "acquired, managed, or disposed of for purposes relating or contributing to the taxpayer's business," the Court stated:

> This definition of unitary business would destroy the concept. The business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently *all* of its operations, including any investment made, in some sense can be said to be 'for purposes related to or contributing to the [corporation's] business.' When pressed to its logical limit, this conception of the 'unitary business' limitation becomes no limitation at all. When less ambitious interpretations are employed, the result is simply arbitrary.

*Id*. at 326 (emphasis in original).

The Court further discussed the unitary business principle in *F. W. Woolworth Co.*, which was argued with and decided the same day as *ASARCO*. Woolworth owned four foreign subsidiaries. Three were wholly owned, and Woolworth owned approxi-

mately 52.7% of the stock in the fourth subsidiary. The New Mexico Taxation and Revenue Department determined that Woolworth should have included the dividends that it received from its subsidiaries in its apportionable income. The Court observed:

> Income, from whatever source, always is a 'business advantage' to a corporation. Our cases demand more. In particular, they specify that the proper inquiry looks to 'the underlying unity or diversity of business enterprise,' . . . not to whether the nondomiciliary parent derives some economic benefit — as it virtually always will — from its ownership of stock in another corporation . . . .
>
> In *Mobil* we emphasized, as relevant to the right of a State to tax dividends from foreign subsidiaries, the question whether 'contributions to income [of the subsidiaries] result[ed] from functional integration, centralization of management, and economies of scale.' . . . If such 'factors of profitability' arising 'from the operation of the business as a whole' exist and evidence the operation of a unitary business, a State can gain a justification for its tax consideration of value that has no other connection with that State.

458 U.S. at 363-64 (citations omitted).

█ The Court applied those principles to the relationship which existed among Woolworth and its foreign subsidiaries and held that a unitary business relationship did not exist. Among the factors that the Court considered in concluding that a unitary business relationship did not exist were: (i) no phase of the subsidiary's business was integrated with the parent's business; (ii) each subsidiary had a complete accounting department and financial staff; (iii) the parent did not engage in any centralized purchasing, manufacturing, or warehousing of merchandise; (iv) the parent had no central personnel training school for its foreign subsidiaries; (v) the subsidiary was responsible for obtaining its own financing from sources other than the parent; (vi) the parent's operations were not functionally integrated with its subsidiaries; (vii) each subsidiary operated as a distinct business enterprise at the level of permanent management and; (viii) with one possible exception, none of the subsidiaries' officers during the year in ques-

tion was a current or former employee of the parent.[4] *Id.* at 364-66.

Application of the principles articulated by the Supreme Court in *Exxon Corp., Mobil Oil Corp., ASARCO,* and *F. W. Woolworth* persuades us to hold that the Department may not, consistent with due process, tax the capital gains and interest income that Corning Glass received from the sale of Owens-Corning stock. The "factors of profitability" arising "from the operation of the business as a whole" do not evidence the operation of a unitary business between Corning Glass and Owens-Corning. In fact, just the contrary exists.

Corning Glass and its employees were prohibited by court order from influencing the business operations of Owens-Corning. Owens-Corning's officers did not consult with Corning Glass regarding business decisions. Corning Glass did not provide financial assistance to Owens-Corning. Corning Glass and Owens-Corning did not assist each other with personnel needs, or share technological or proprietary information. Corning Glass and Owens-Corning did not engage in any bulk purchase of supplies. Corning Glass did not purchase equipment for Owens-Corning. Corning Glass and Owens-Corning did not use each other's distribution systems to market products. The two companies did not share any professional services. Corning Glass received information about Owens-Corning through public disseminations that Owens-Corning distributed to all its shareholders. With the exception of dividend payments Owens-Corning made to Corning Glass, there was no flow of funds between the two companies.

It is true that Corning Glass had significant stock holdings in Owens-Corning and other corporations. However, this fact alone is not sufficient to support a legal conclusion that a unitary business relationship existed between Corning Glass and Owens-Corning. As the Supreme Court has stated:

---

[4] The Court held that a unitary relationship did not exist even though there were managerial links, irregular in-person and frequent mail, telephone, and teletype communications between the upper echelons of management of the parent and the subsidiaries. "Decisions about major financial decisions, such as the amount of dividends to be paid by the subsidiaries and the creation of substantial debt, had to be approved by the parent . . . . Woolworth's published financial statements, such as its annual reports, were prepared on a consolidated basis." *F. W. Woolworth Co.,* 458 U.S. at 368-69.

> [T]he [unitary business] principles . . . require that the out-of-state activities of the purported 'unitary business' be related in some concrete way to the in-state activities. The functional meaning of this requirement is that there be some sharing or exchange of value not capable of precise identification or measurement — beyond the mere flow of funds arising out of a passive investment or a distinct business operation — which renders formula apportionment a reasonable method of taxation.

*Container Corp.* v. *Franchise Tax Bd.*, 463 U.S. 159, 166 (1983). Additionally, "[o]ne must look principally at the underlying activity, not at the form of investment, to determine the propriety of apportionability." *Mobil Oil Corp.*, 445 U.S. at 440.

■ An examination of the underlying activity between Corning Glass and Owens-Corning makes it exceedingly clear that a unitary business relationship did not exist and legally could not have existed in view of the judgment order entered in the antitrust case. Accordingly, we will reverse the judgment of the trial court and remand this proceeding for the entry of an order consistent with this decision.[5]

*Reversed and remanded.*

---

[5] In view of our decision, we need not consider the appellant's other assignments of error.